# EXHIBIT A

EXHIBIT A

3:44 P.M.

**Miscellaneous Docket Sheet**                    Commonwealth Court of Pennsylvania

**Docket Number:  58 MD 2013**

**Page 1 of 4**

**March 4, 2013**

CAPTION

Commonwealth of Pennsylvania
by Attorney General
Kathleen G. Kane,
Plaintiff
v.
The McGraw-Hill Companies, Inc.
and Standard & Poor's Financial
Services, LLC,
Defendants

CASE INFORMATION

| | | |
|---|---|---|
| Initiating Document: | Complaint | |
| Case Status: | Active | |
| Case Processing Status: | February 5, 2013 | Awaiting Answer |
| Journal Number: | | |
| Case Category: | Miscellaneous | Case Type(s):  Civil Action Law |

CONSOLIDATED CASES                                    RELATED CASES

COUNSEL INFORMATION

**Plaintiff**      **Kane, Kathleen G.**
Pro Se:       No
IFP Status:

| | | |
|---|---|---|
| Attorney: | Abel, John Michael | |
| Law Firm: | Office of the Attorney General | |
| Address: | Bureau of Consumer Protection | |
| | Strawberry Square - 15th Floor | |
| | Harrisburg, PA 17120 | |
| Phone No: | (717) 787-9707 | Fax No: (717) 787-1190 |

| | | |
|---|---|---|
| Attorney: | Gerdes, Michael Curry | |
| Law Firm: | PA Office of Attorney General | |
| Address: | Strawberry Square 15th Fl | |
| | Harrisburg, PA 17120 | |
| Phone No: | (717) 787-9707 | Fax No: (717) 705-3795 |

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability
for inaccurate or delayed data, errors or omissions on the docket sheets.

3:44 P.M.

**Miscellaneous Docket Sheet**

**Commonwealth Court of Pennsylvania**

**Docket Number: 58 MD 2013**

**Page 2 of 4**

**March 4, 2013**



### COUNSEL INFORMATION

| | |
|---|---|
| **Plaintiff** | **Commonwealth of Pennsylvania** |
| Pro Se: | No |
| IFP Status: | |

| | | |
|---|---|---|
| Attorney: | Abel, John Michael | |
| Law Firm: | Office of the Attorney General | |
| Address: | Bureau of Consumer Protection | |
| | Strawberry Square - 15th Floor | |
| | Harrisburg, PA 17120 | |
| Phone No: | (717) 787-9707 | Fax No: (717) 787-1190 |

| | | |
|---|---|---|
| Attorney: | Gerdes, Michael Curry | |
| Law Firm: | PA Office of Attorney General | |
| Address: | Strawberry Square 15th Fl | |
| | Harrisburg, PA 17120 | |
| Phone No: | (717) 787-9707 | Fax No: (717) 705-3795 |

| | | |
|---|---|---|
| **Defendant** | **The McGraw-Hill Companies, Inc.** | |
| Pro Se: | No | |
| IFP Status: | | |

| | | |
|---|---|---|
| Attorney: | Stover, Jack Mentzer | |
| Law Firm: | Buchanan Ingersoll & Rooney PC | |
| Address: | 409 N Second St Ste 500 | |
| | Harrisburg, PA 17101 | |
| Phone No: | (717) 237-4837 | Fax No: (717) 233-0852 |
| Phone No: | (717) 237-4800 | |

| | | |
|---|---|---|
| Attorney: | Wolfgang, Jayson R. | |
| Law Firm: | Buchanan Ingersoll & Rooney, P.C. | |
| Address: | 409 N. Second Street, Suite 500 | |
| | Harrisburg, PA 17101 | |
| Phone No: | (717) 237-4800 | Fax No: (717) 233-0852 |

| | | |
|---|---|---|
| Attorney: | Budman, Jan L., II | |
| Law Firm: | Buchanan Ingersoll & Rooney, P.C. | |
| Address: | 409 N. Second Street, Suite 500 | |
| | Harrisburg, PA 17101 | |
| Phone No: | (717) 512-8490 | Fax No: (717) 233-0852 |

| | | |
|---|---|---|
| Attorney: | Cline, Holly Lechliter | |
| Law Firm: | Buchanan Ingersoll & Rooney, P.C. | |
| Address: | 409 N. Second Street, Suite 500 | |
| | Harrisburg, PA 17101 | |
| Phone No: | (717) 237-4887 | Fax No: (717) 233-0852 |

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability
for inaccurate or delayed data, errors or omissions on the docket sheets.

3:44 P.M.

**Miscellaneous Docket Sheet**                    Commonwealth Court of Pennsylvania

**Docket Number: 58 MD 2013**

**Page 3 of 4**

**March 4, 2013**

## COUNSEL INFORMATION

**Defendant**   **Standard & Poor's Financial Services, LLC**
Pro Se:        No
IFP Status:

| | |
|---|---|
| Attorney: | Stover, Jack Mentzer |
| Law Firm: | Buchanan Ingersoll & Rooney PC |
| Address: | 409 N Second St Ste 500 |
| | Harrisburg, PA 17101 |
| Phone No: | (717) 237-4837 | Fax No: (717) 233-0852 |
| Phone No: | (717) 237-4800 | |

| | |
|---|---|
| Attorney: | Wolfgang, Jayson R. |
| Law Firm: | Buchanan Ingersoll & Rooney, P.C. |
| Address: | 409 N. Second Street, Suite 500 |
| | Harrisburg, PA 17101 |
| Phone No: | (717) 237-4800 | Fax No: (717) 233-0852 |

| | |
|---|---|
| Attorney: | Budman, Jan L., II |
| Law Firm: | Buchanan Ingersoll & Rooney, P.C. |
| Address: | 409 N. Second Street, Suite 500 |
| | Harrisburg, PA 17101 |
| Phone No: | (717) 512-8490 | Fax No: (717) 233-0852 |

| | |
|---|---|
| Attorney: | Cline, Holly Lechliter |
| Law Firm: | Buchanan Ingersoll & Rooney, P.C. |
| Address: | 409 N. Second Street, Suite 500 |
| | Harrisburg, PA 17101 |
| Phone No: | (717) 237-4887 | Fax No: (717) 233-0852 |

## FEE INFORMATION

| Fee Dt | Fee Name | Fee Amt | Receipt Dt | Receipt No | Receipt Amt |
|---|---|---|---|---|---|
| 02/05/2013 | Miscellaneous Docket Filing Fee | 53.50 | 02/05/2013 | 2013-CMW-H-000252 | 53.50 |
| 02/07/2013 | Copy Work (Per Page) | 11.00 | 02/07/2013 | 2013-CMW-H-000266 | 11.00 |
| 02/19/2013 | Copy Work by Clerk (Per Page) | 21.00 | 02/19/2013 | 2013-CMW-H-000332 | 21.00 |
| 02/25/2013 | Fax Orders Account | 50.00 | 02/25/2013 | 2013-CMW-H-000390 | 50.00 |

## AGENCY/TRIAL COURT INFORMATION

Court Below:
County:                                          Division:
Order Appealed From:                             Judicial District:
Documents Received:    February 5, 2013          Notice of Appeal Filed:
Order Type:
OTN(s):
Lower Ct Docket No(s):
Lower Ct Judge(s):

## ORIGINAL RECORD CONTENT

| Original Record Item | Filed Date | Content Description |
|---|---|---|

**Date of Remand of Record:**

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability
for inaccurate or delayed data, errors or omissions on the docket sheets.

3:44 P.M.

**Miscellaneous Docket Sheet**

**Docket Number: 58 MD 2013**

**Page 4 of 4**

**March 4, 2013**

Commonwealth Court of Pennsylvania



### BRIEFING SCHEDULE

| | |
|---|---|
| None | None |

### DOCKET ENTRY

| Filed Date | Docket Entry / Filer | Representing | Participant Type | Exit Date |
|---|---|---|---|---|
| February 5, 2013 | Complaint Filed | | | |
| | Commonwealth of Pennsylvania | | Plaintiff | |
| | Kane, Kathleen G. | | Plaintiff | |
| February 6, 2013 | Notice Exited | | | 02/06/2013 |
| | Commonwealth Court Filing Office | | | |
| February 25, 2013 | Entry of Appearance | | | |
| | Budman, Jan L., II | The McGraw-Hill Companies, Inc. | Defendant | |
| | Budman, Jan L., II | Standard & Poor's Financial Service: | Defendant | |
| | Cline, Holly Lechliter | The McGraw-Hill Companies, Inc. | Defendant | |
| | Cline, Holly Lechliter | Standard & Poor's Financial Service: | Defendant | |
| | Stover, Jack Mentzer | The McGraw-Hill Companies, Inc. | Defendant | |
| | Stover, Jack Mentzer | Standard & Poor's Financial Service: | Defendant | |
| | Wolfgang, Jayson R. | The McGraw-Hill Companies, Inc. | Defendant | |
| | Wolfgang, Jayson R. | Standard & Poor's Financial Service: | Defendant | |
| February 25, 2013 | Letter | | | |
| | Stover, Jack Mentzer | The McGraw-Hill Companies, Inc. | Defendant | |
| | Stover, Jack Mentzer | Standard & Poor's Financial Service: | Defendant | |
| | Document Name: Fax Order request w/$50.00 fee paid. | | | |
| February 28, 2013 | Certificate of Service Filed | | | |
| | Abel, John Michael | Commonwealth of Pennsylvania | Plaintiff | |
| | Abel, John Michael | Kane, Kathleen G. | Plaintiff | |
| | Document Name: Acceptance of Service | | | |

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

# DIVIDER SHEET

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>BY ATTORNEY GENERAL<br>KATHLEEN G. KANE, : | Case No. 58 MD 2013 |
| : | CIVIL ACTION |
| PLAINTIFF : | |
| : | |
| v. : | |
| : | |
| THE MCGRAW-HILL COMPANIES, INC. : | |
| and STANDARD & POOR'S FINANCIAL : | |
| SERVICES, LLC, : | |
| : | |
| DEFENDANTS : | |

### NOTICE

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU, AND A JUDGMENT MAY BE ENTERED AGAINST YOU WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.

YOU SHOULD TAKE THIS NOTICE TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE(S) SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE

TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER

LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Central Pennsylvania Legal Services, Inc.
213-A North Front Street
Harrisburg, PA 17101
(717) 232-0581

Public Services and Legal Referral Committee
Dauphin County Bar Association
213 North Front Street
Harrisburg, PA 17101
(717) 232-7536

John M. Abel
Senior Deputy Attorney General
PA Attorney I.D. No. 47313

Michael C. Gerdes
Senior Deputy Attorney General
PA Attorney I.D. No. 88390

Office of Attorney General
Bureau of Consumer Protection
15th Floor Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-9707
Fax: (717) 705-3795
Attorneys for Plaintiff

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>BY ATTORNEY GENERAL<br>KATHLEEN G. KANE, | : <br> : <br> : <br> : | Case No. <br><br> CIVIL ACTION |
| **PLAINTIFF** | : <br> : | |
| v. | : <br> : | |
| THE MCGRAW-HILL COMPANIES, INC.<br>and STANDARD & POOR'S FINANCIAL<br>SERVICES, LLC, | : <br> : <br> : <br> : | |
| **DEFENDANTS** | : | |

RECEIVED & FILED
COMMONWEALTH COURT
OF PENNSYLVANIA

2013 FEB -5 P 12: 26

### COMPLAINT

**AND NOW,** comes the Commonwealth of Pennsylvania, by Attorney General Kathleen

G. Kane, through the Bureau of Consumer Protection (hereinafter "Commonwealth" or

"Plaintiff"), and brings this action pursuant to the <u>Unfair Trade Practices and Consumer</u>

<u>Protection Law</u>, 73 P.S. § 201-1, *et seq*. (hereinafter "Consumer Protection Law"), to restrain

unfair methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce declared unlawful by Section 201-3 of the Consumer Protection Law. The

Consumer Protection Law authorizes the Attorney General to bring an action in the name of the

Commonwealth of Pennsylvania to restrain by temporary or permanent injunction unfair

methods of competition or unfair or deceptive acts or practices in the conduct of any trade or

commerce declared unlawful by Section 201-3 of the Consumer Protection Law. In support of

this action the Commonwealth respectfully represents the following:

### JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 42 Pa.C.S.A. § 761.

1

## PARTIES

2.    Plaintiff is the Commonwealth of Pennsylvania, by Attorney General Kathleen G. Kane, through the Bureau of Consumer Protection, 15th Floor, Strawberry Square, Harrisburg, Dauphin County, Pennsylvania 17120.

3.    Defendant the McGraw-Hill Companies, Inc. (hereinafter "McGraw-Hill") is a New York for-profit business corporation with principal executive offices located at 1221 Avenue of the Americas, New York, New York 10020.

4.    Defendant Standard & Poor's Financial Services, LLC ("S&P Financial") is a Delaware limited liability company, and wholly owned subsidiary of McGraw-Hill with offices located at 55 Water Street, New York, New York 10041.

## BACKGROUND

5.    S&P Financial includes a business unit known as Standard & Poor's Ratings Services ("S&P Ratings"), which operates as a credit rating agency assigning credit ratings to a range of securities.

6.    Defendant McGraw-Hill, by itself and through its subsidiary S&P Financial, and its business unit S&P Ratings (referred herein collectively as "S&P" or "Defendants"), at all times relevant hereto, engaged in trade or commerce within the Commonwealth of Pennsylvania through the sale of credit rating services and by providing credit ratings for use by investors and other market participants within Pennsylvania.

7.    Unless otherwise specified, whenever reference is made in this complaint to any act of any of the Defendants or any employee and/or agent of the Defendants, such allegations shall be deemed to mean the act of Defendant McGraw-Hill and Defendant S&P Financial, acting individually, jointly or severally.

2

8.     At all times relevant and material hereto the unfair or deceptive methods, acts, and practices complained of herein have been willfully used by Defendants.

A.     Overview of Business

9.     The Defendants publicly tout their independence and objectivity in performing credit ratings on certain securities. In truth and in fact, however, Defendants were not independent and objective.  The Defendants' financial interests, or the financial interests of their clients, influenced their credit ratings.

10.     This conduct occurred nationwide, as well as in Pennsylvania, thereby directly, as well as indirectly, affecting the people of this Commonwealth.

11.     S&P regularly does business within the Commonwealth of Pennsylvania and derives substantial revenues from its business within the Commonwealth of Pennsylvania.

12.     At all times relevant and material hereto, S&P engaged in trade or commerce in the Commonwealth of Pennsylvania by, among other things, marketing its credit ratings of financial securities to Pennsylvania investors and other market participants.

13.     Credit ratings are grades of creditworthiness assigned to securities, and are used by investors to determine the relative risk associated with investing in those securities.

14.     Defendant S&P is a market leader for providing credit ratings of a specific type of security known as structured finance securities in capital markets in the United States and abroad.

15.     S&P's credit ratings use a scale of letter grades, with "AAA" being the highest grade and indicating a low risk of default and therefore a safer investment, and "D" being the lowest grade and indicating the highest risk of default (or that a default has already occurred) and therefore a riskier investment.

3

16.     Structured finance securities are Asset-Backed Securities ("ABS"), a financial product whose value is derived from the stream of revenue flowing from a pool of underlying assets. Those securities are sold to investors who rely upon the revenue stream generated from the underlying asset pool for the repayment of their principal and interest.

17.     Many different types of assets can serve as collateral for ABS. Some of the most common types of assets used to support an ABS are residential and commercial mortgages.

18.     The largest type of structured finance securities are residential mortgage-backed securities ("RMBS").

19.     The most common type of structured finance securities collateralized by other securities are known as collateralized debt obligations ("CDOs"). The underlying securities for CDOS might include RMBS or commercial mortgage-backed securities ("CMBS"), as examples.

20.     While the asset pool underlying a structured finance security may vary, the mechanism for transforming the pool of assets into an ABS by way of the securitization process is generally the same.

21.     The process for creating an RMBS begins when an arranger, generally an investment bank, packages mortgage loans into a pool and transfers them to a trust that will issue securities collateralized by the pool. The trust purchases the loan pool from the arranger and becomes entitled to the interest and principal payments made by the borrowers, which is used to make monthly interest and principal payments to the investors in the RMBS.

22.     To appeal to investors with different risk appetite, the trust issues different classes of RMBS, known as tranches. These classes offer a sliding scale of interest rates based on the level of risk and credit protection afforded to each tranche. Credit protection is designed to shield the securities within a tranche from the loss of interest and principal due to defaults of

4

the loans in the overall pool. The degree of credit protection afforded any tranche of securities is known as credit enhancement.

23.     The main source of credit enhancement is subordination. Subordination refers to a prioritization of losses by defaults among the tranches. Any loss of interest and principal experienced by the trust from delinquencies and defaults in loans in the pool are allocated first to the tranche with the highest interest rate, but lowest level of credit protection, until it loses its entire principal amount. Then losses are allocated to the next lowest tranche. Consequently, the most senior tranche, and therefore the tranche with the greatest credit protection, would not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

24.     The process for creating a typical CDO is similar to that of an RMBS. Specifically, a sponsor creates a trust or other special purpose entity to hold assets and issues securities. Instead of the mortgage loans that are held in RMBS pools, a CDO trust is typically comprised of multiple debt securities such as RMBS. The trust then uses the interest and principal payments from the underlying debt securities to make interest and principal payments to investors in the CDO securities issued by the trust.

25.     CDO trusts have been among the largest purchasers of subprime RMBS and have been one of the biggest drivers of demand for these securities.

26.     A CDO trust also issues different classes of securities divided into tranches that provide differing levels of credit protection through the use of subordination and other forms of credit enhancement. So long as the underlying assets continue to perform, the cash flow continues and the performance of each of the tranches of the CDO remains strong. Just as is the case with RMBS, the lowest rated tranches absorb any losses due to delinquencies and defaults. If the underlying assets begin to default, the cash flow diminishes and the investors at each CDO

5

tranche level are subjected to risk starting from the bottom or equity tranches and proceeding upward.

27.     Little public information is available about the underlying collateral behind RMBS and CDOs. These securities are difficult even for sophisticated investors to evaluate.

28.     Consequently, investors rely upon the credit ratings of the securities to evaluate the creditworthiness of those RMBS or CDOs, and therefore whether they should invest in the securities.

29.     Credit ratings are used to simplify the investment process, and enhance the sales of the securities.

30.     Issuers of RMBS and CDOs, which are financial companies such as banks, mortgage companies, finance companies, and investment banks, strive to obtain favorable credit ratings to ensure a robust market for their products.

31.     Without a credit rating for the securities, issuers seeking to offer such securities for sale would have a difficult time marketing the securities because each investor would have to do his or her own due diligence of the value of the underlying collateral to evaluate the risk of the investment.

32.     Historically, credit rating agencies' ratings were considered credible because the agencies possessed the expertise to evaluate the various asset types underlying the securities, and because the agencies had no financial interest in a security's cost or yield.

33.     Credit rating agencies, including S&P, are compensated by the issuers of those securities, for rating structured finance securities, with the fee amount proportional to the size and complexity of the structured finance security being rated.

34.     In the market for structured finance securities, a relatively small number of issuers repeatedly seek credit ratings from an even smaller number of credit ratings agencies who rate such securities.

35.     The issuers leverage this situation by engaging in the practice known as "ratings shopping", *i.e.*, seeking credit ratings from each of the major credit rating agencies, and offering their business to the credit rating agency which provides the highest rating while requiring the least amount of credit enhancements or credit support.

36.     The few credit rating agencies which rate structured finance securities, including S&P, compete against each other in an effort to be the credit rating agency chosen to rate a given security, and thereby obtain repeat business and fees from the issuer.

B.     S&P's Public Representations

37.     S&P markets its credit ratings as objective and independent, uninfluenced by the issuer or other outside parties, and, consequently, worthy of reliance by investors.

38.     By way of example, S&P in its 2004 Code of Practices and Procedures, which S&P released publicly and made available on its website, noted that it "endeavors to conduct the rating and surveillance process in a manner that is transparent and credible and that also ensures that the integrity and independence of such processes are not compromised by conflicts of interest, abuse of confidential information, or other undue influences." In this same document, S&P also promised that S&P's "mission has always remained the same – to provide high-quality, objective, independent, and rigorous analytical information to the marketplace" and that "in all analytic processes, [S&P] must preserve the objectivity, integrity and independence of its ratings. In particular, the fact that [S&P] receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion."

7

39.     S&P's vow of independence, objectivity and integrity were further codified in October of 2005, when it adopted a Code of Professional Conduct ("S&P's Code" or the "Code") for its ratings practices, which S&P also made publicly available.

40.     In a 2006 report explaining the implementation of the Code of Conduct, S&P made the following statements:

- "[S&P] recognizes its role in the global capital markets and is committed to providing ratings that are objective, independent and credible…";

- "It is a central tenet of [S&P] that its ratings decisions not be influenced by the fact that S&P receives fees from issuers…";

- "Ratings are monitored on an ongoing basis in accordance with S&P's policies unless a rating is a point in time confidential rating without surveillance…"; and

- "[S&P's] Code reflects further alignment of its policies and procedures with the [International Organization of Securities Commissions] ("IOSCO") Code of Conduct."

41.     Echoing the above pledge, S&P's Code also notes that "[S&P] fully supports the essential purpose of the IOSCO Code, which is to promote investor protection by safeguarding the integrity of the rating process.  [S&P] believes that the Code is consistent with the IOSCO Code and appropriately implements IOSCO's Statements of Principles Regarding the Activities of Credit Rating Agencies"

42.     One of the key principles set forth in the IOSCO Code (first published in December of 2004) was the need for credit rating agencies such as S&P to maintain independence from the issuers who pay it for its ratings.

8

43. In particular, the IOSCO Code sets forth the principle that "the essential purpose of the Code Fundamentals is to promote investor protection by safeguarding the integrity of the rating process. IOSCO members recognize that credit ratings, despite their numerous other uses, exist primarily to help investors assess the credit risks they face when making certain kinds of investments. Maintaining the independence of credit rating agencies vis-à-vis the issuers they rate is vital to achieving this goal. Provisions of the Code Fundamentals dealing with credit rating obligations to issuers are designed to improve the quality of credit ratings and their usefulness to investors."

44. Similarly, the IOSCO Code also emphasizes that "[r]ating analyses of low quality or produced through a process of questionable integrity are of little use to market participants," and that "[w]here conflicts of interest or a lack of independence is common at a credit rating agency and hidden from investors, overall investor confidence in the transparency and integrity of a market can be harmed."

45. With these principles as a guide, since October of 2005, S&P has made several representations in its Code about the manner in which S&P maintains the independence and objectivity of its analysis and avoids conflicts of interest with issuers. The most important of these representations were found in sections 1.12, 2.1 – 2.4, and 1.9 of the October 2005 Code.

46. Although S&P's Code has been modified over time since October 2005, the substance of these code sections has been reflected and carried forward in later codes.

47. The substance of the aforementioned sections have continued to be referenced in several public statements by S&P since the Code's adoption in October of 2005.

9

48. S&P uses proprietary methodologies to reach its ratings on such securities, and touts those methodologies as objective and comprehensive, thereby yielding accurate and unbiased ratings.

49. Furthermore, in its Annual Reports, S&P has repeatedly emphasized its role as an independent expert.

50. By way of example, the S&P 2008 Annual Report states that "[i]t is important to note that S&P has effectively served the global capital markets with high quality, independent and transparent credit ratings for many decades" and highlights that "[t]o ensure the continued integrity and relevance of its ratings business, [S&P]…has undertaken a series of actions which further enhance transparency and the independence of its ratings process."

51. In addition to the statements made by S&P in its Annual Reports and its Codes of Conduct, S&P has made similar representations before Congress.

52. For example, in April 2007 testimony before the Senate Committee on Banking, Housing and Urban Affairs, S&P's then Managing Director of RMBS, Susan Barnes, testified regarding S&P's "ongoing" monitoring of the accuracy and integrity of its ratings, and stated that "[a]fter a rating is assigned, S&P monitors or 'surveils' the ratings to adjust for any developments that would impact the original rating. The purpose of this surveillance process is to ensure that the rating continues to reflect our credit opinion based on our assumption of the future performance of the transaction."

53. Barnes further testified that S&P's credit ratings are "grounded in the cornerstone principles of independence, transparency, credibility, and quality. These principles have driven our long-standing track record of analytical excellence and objective commentary."

10

54.     In October 2008, Deven Sharma, President of Standard & Poor's Financial
Services, LLC, testified before the House Committee on Oversight and Government Reform.  He
testified that "[t]he real question is not whether there are potential conflicts of interest in the
'issuer pays' model, but whether they can be effectively managed…S&P maintains rigorous
policies and procedures around the integrity of our analytical processes through a number of
checks and balances…Taken together, we believe these measures provide robust safeguards
against the potential conflicts of interest inherent in the 'issuer pays' model."

55.     Sharma further testified that "[t]he key question for any approach, whether it be
investor or issuer paid, is then whether the rating agency takes appropriate steps to preserve its
independence.  For S&P, *that independence is a core principle of our business*." (emphasis
added).

C.      The Economic Reality Behind S&P's Public Representations

56.     Despite its public representations to the contrary, S&P's credit ratings of
structured finance securities, including RMBS and CDOs, were not independent and objective,
but rather were driven by S&P's desire to increase its own revenue and market share.

57.     S&P tailored its own ratings methodologies in order to ensure higher credit
ratings with minimal credit enhancement, in order to meet the expectations of the issuers of such
securities, and therefore increase the likelihood that the issuer of the securities would choose
S&P over its competitors for future business.

58.     By altering its methodologies in order to win business from the issuers, S&P
compromised is independence and objectivity, thereby rendering false and/or misleading its
public representations about the independence and reliability of its credit ratings.

11

59.     Furthermore, between 2001 and 2008, S&P failed to update its ratings model with up-to-date performance data on residential loans, including data regarding the growing subprime mortgage market.

60.     S&P's use of an outdated ratings model was motivated by S&P's desire to continue to please issuers by assigning AAA ratings with minimal credit enhancement, and thereby maintain S&P's market share for RMBS.

61.     Similarly, the ongoing surveillance function mentioned by Ms. Barnes in her 2007 testimony, *supra*, at Paragraph 52, was likewise compromised by S&P's business considerations.

62.     The robust surveillance which S&P publicly postured would have led to volatility and securities downgrades, damaging its business by calling into question the validity of its AAA ratings.

63.     Consequently, despite public representations of its robust surveillance processes, S&P devoted few resources to monitoring its RMBS ratings, and thereby allowed much of the credit risk of RMBS to remain hidden from investors.

64.     In early to mid-2007, when S&P was aware that many of the RMBS and CDOs which it had rated were in severe danger of default and should be downgraded, S&P publicly affirmed its prior ratings while privately discussing that the risks were much higher than the credit ratings suggested.

65.     Ultimately, beginning in July 2007, S&P downgraded its ratings on scores of previously issued RMBS and CDOs.

66.     As recently as late 2011, S&P continued to allow its business considerations, including its market share for rating structured finance securities and its potential revenue, to influence its credits ratings' methodologies and decisions.

12

D.    S&P's Quest for Revenue Influenced its Analytical Models

67.    S&P made adjustments to the assumptions built into its analytical models used to rate RMBS and CDOs or, alternatively, S&P refrained from updating its analytical models based on the best information available to S&P, in order to preserve the use of analytical models that were appealing to issuers.

68.    S&P engaged in this conduct for the explicit purpose of allowing it to assign its highest rating of "AAA" to as large a portion of the structured finance securities it rated as possible.

69.    By at least 2001, S&P's focus on monitoring and growing its market share and generating additional revenue dominated the attention of S&P's senior management. This compulsion to maximize revenue influenced the analytical models that S&P developed and implemented for rating RMBS and other structured finance securities.

70.    S&P successfully competed for an issuer's structured finance business adjusting its analytical models so that its levels of proposed credit enhancement reflected the issuer's expectations.

71.    As a result, S&P focused on meeting the demands of the repeat issuers that paid it its fees, rather than providing an objective credit analysis that was independent of and not influenced by the financial interests of either S&P or its clients.

72.    S&P's decision to compete on the basis of loosening its analytical models, thereby making it easier to assign a "AAA" rating to as large a portion of the structured finance securities it rated as possible, was entirely inconsistent with its public representations.

13

73.     S&P's decision to compete on the basis of loosening its analytical models resulted in a race to the bottom in the credit rating industry, where robust credit analysis was actually an impediment to a credit rating agency maintaining or growing its revenue.

74.     S&P's decision to compete for business by loosening its analytical models resulted in its misrepresenting the nature of its ratings to the public, consumers and other market participants.

75.     Given S&P's dominant position in the market for rating structured finance securities, S&P's decision to compete for business in this manner also punished those credit rating agencies interested in living up to their public representations and made it impossible for such entities to successfully compete based on the strength of their independent credit analysis.

76.     S&P's adjustments to its analytical models based on revenue and market share concerns began as early as 2001, and laid the foundation for S&P's mass downgrades of RMBS during the summer of 2007.

77.     S&P's decision between at least 2001 and 2008, to use outdated models for analyzing RMBS, allowed S&P continue to assign the "AAA" ratings with minimal credit enhancement that issuers coveted, thus preserving S&P's market share and earning much more revenue for the company.

78.     Updating its analytical models would have run the risk of disrupting S&P's already dominant and highly profitable business of rating RMBS.

79.     S&P's desire for increased revenue and maintenance of its high market share also led S&P to make several adjustments to the analytical model used by S&P to rate CDOs in order to make them more business friendly and appealing to CDO issuers.

14

80. The undisclosed influences of market share and increased revenue outlined above did not just drive S&P analysis in the years leading up to the financial crisis: in 2011, S&P continued to adjust the assumptions of the analytical models that it used to rate structured finance securities so that S&P could more easily assign its highest ratings and, thereby, increase its market share and revenue.

81. S&P engaged in this conduct in late 2011 at the request of and with the full knowledge and support of its senior leadership.

E. S&P's Surveillance Group Was Ignored and Designed to Fail

82. S&P's focus on business considerations also influenced the manner in which it monitored, or conducted surveillance on, the structured finance securities it had already rated.

83. Prior to 2008, S&P performed only a sporadic and cursory review of its RMBS's ratings and did not use the best surveillance tools that were at its disposal.

84. This conduct was in sharp contrast to the public representations of S&P's senior executives, including the managing director of RMBS, highlighting that the company maintained a robust surveillance process with substantial resources at its disposal that allowed S&P to timely and thoroughly monitor the performance of previously rated RMBS.

85. S&P did not dedicate the necessary resources to effectively conduct surveillance on previously rated RMBS and failed to use its analytical models as part of the monitoring process of these obligations.

86. S&P failed to properly fund and dedicate the appropriate number of personnel to surveillance, and did not use the best tools that it had available to conduct surveillance on previously rated RMBS.

15

87. S&P's pursuit of increased revenue and market share also resulted in it ignoring the recommendations of its surveillance group and delaying the downgrade of impaired RMBS in order to further its own financial interests, as well as the financial interests of its issuer clients.

## COUNT I
## VIOLATIONS OF UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW

88. The Commonwealth incorporates the preceding paragraphs herein as though they were fully set forth.

89. By reason of the foregoing, Defendants misrepresented the nature of their business as independent and objective experts, uninfluenced by their own business interests when in fact that was not the case.

90. By misrepresenting and/or omitting factors it considered when analyzing structured finance securities, S&P offered a product and/or service that was materially different from what it purported to provide to the marketplace.

91. The foregoing acts and practices constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Consumer Protection Law, 73 P.S. § 201-3, as defined by Section 201-2(4) by, among other things:

    a.     Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

    b.     Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

    c.     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

16

      d.    Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

      e.    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

73 P.S. §§ 201-2(4)(ii), (iii), (v), (vii), and (xxi)

## PRAYER FOR RELIEF

**WHEREFORE**, the Commonwealth respectfully requests this Honorable Court to issue an Order:

A.    Declaring the Defendants' conduct to be in violation of the Consumer Protection Law;

B.    Permanently enjoining the Defendants, their agents, successors, assigns, and employees acting directly or through any corporate device from engaging in the aforementioned acts, practices, methods of competition, or any other practice violative of the Consumer Protection Law;

C.    Directing the Defendants to comply with the Consumer Protection Law and any amendments thereto;

D.    Directing the Defendants to make full restitution to all consumers who have suffered losses as a result of the acts and practices alleged in this Complaint and any other acts or practices which violate the Consumer Protection Law;

E.    Directing the Defendants, pursuant to Section 201-8(b) of the Consumer Protection Law, to pay civil penalties in the amount of One Thousand and 00/100 Dollars ($1,000.00) for each and every violation of the Consumer Protection Law, which will increase to Three Thousand and 00/100 Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older;

17

F.     Directing the Defendants to disgorge and forfeit all profits they have
derived as a result of their unfair and deceptive acts and practices as set forth in this Complaint;

G.     Directing the Defendants to pay the Commonwealth for the costs of its
investigation and prosecution of this action;

H.     Directing the Defendants to forfeit their right or franchise to engage in the
business within the Commonwealth of Pennsylvania until such time as all monies have been paid
for restitution, costs and civil penalties; and

I.     Providing any other such relief as the Court may deem necessary and
appropriate.

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA
KATHLEEN G. KANE
Attorney General

Date: 2-5-13

By: _____

JOHN M. ABEL
Senior Deputy Attorney General
PA Attorney I.D. No. 47313

Michael C. Gerdes
Senior Deputy Attorney General
PA Attorney I.D. No. 88390
Office of Attorney General
Bureau of Consumer Protection
15th Floor, Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-9707
Fax: (717) 705-3795

18

## **VERIFICATION**

I, Nicole R. Beck, being duly sworn according to law, hereby state that I am in excess of eighteen (18) years of age and that I am an Agent for the Office of Attorney General, Bureau of Consumer Protection, and that I am authorized to make this Verification and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

*Nicole Beck*
Nicole R. Beck
Consumer Protection Agent

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| BY ATTORNEY GENERAL | : | Case No. 58 M.D. 2013 |
| KATHLEEN G. KANE, | : | |
| | : | CIVIL ACTION |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| THE MCGRAW-HILL COMPANIES, INC. | : | |
| and STANDARD & POOR'S FINANCIAL | : | |
| SERVICES, LLC, | : | |
| | : | |
| DEFENDANTS | : | |

## ACCEPTANCE OF SERVICE

I, Adam Zurofsky, Esquire, accept service of the Complaint on behalf of Defendants the McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services, LLC, and certify that I am authorized to do so.

_____
Date

_____
Adam Zurofsky, Esquire
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, New York 10005-1702

# DIVIDER SHEET



## Commonwealth Court of Pennsylvania

Kristen W. Brown
Prothonotary
Michael Krimmel, Esq.
Chief Clerk of Commonwealth Court

Pennsylvania Judicial Center
601 Commonwealth Avenue, Suite 2100
P.O. Box 69185
Harrisburg, PA 17106-9185
www.pacourts.us

February 6, 2013

### NOTICE OF FILING PETITION FOR REVIEW OR COMPLAINT

RE:  Com. v. McGraw-Hill Co.'s Inc. et al.
58 MD 2013
Filed Date:  February 5, 2013

A Complaint has been filed in the original jurisdiction of the Commonwealth Court of Pennsylvania.  The docket number is endorsed on the enclosed cover page of the  Complaint. The date of filing is on the top of this notice.

Responsive pleadings and motions filed in compliance with  the  appropriate rules of procedure should be addressed to the office shown on the attached page.

Any motions or applications filed should include a proposed order.  Answers to motions or applications should also include a proposed order.  Failure to provide a proposed order may result in the matter being returned to you for compliance.  The Commonwealth Court docket number must be on all correspondence and documents filed with the Court.

The addresses to which you must transmit all documents are set forth on the last page of this notice.

If you have special needs, please contact this court in writing as soon as possible.

| Attorney Name | Participant Name | Participant Type |
|---|---|---|
| John Michael Abel, Esq. | Commonwealth of Pennsylvania | Plaintiff |
| John Michael Abel, Esq. | Kathleen G. Kane | Plaintiff |
| Michael Curry Gerdes, Esq. | Commonwealth of Pennsylvania | Plaintiff |
| Michael Curry Gerdes, Esq. | Kathleen G. Kane | Plaintiff |

Enclosure

Address all written communications and direct all filings to:

Office of the Chief Clerk
Commonwealth Court of Pennsylvania
Pennsylvania Judicial Center
601 Commonwealth Avenue, Suite 2100
P.O. Box 69185
Harrisburg, PA 17106-9185
(717) 255-1650

Filings may be made in person between 9:00 a.m. and 4:00 p.m. (except Saturdays, Sundays, and holidays observed by the Pennsylvania courts), by mail as provided by general rules, or as otherwise permitted by general rules of court.

# DIVIDER SHEET

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
BY ATTORNEY GENERAL
KATHLEEN G. KANE,

    PLAINTIFF

    v.

THE MCGRAW-HILL COMPANIES, INC.
and STANDARD & POOR'S FINANCIAL
SERVICES, LLC,

    DEFENDANTS

Case No. 58 M.D. 2013

CIVIL ACTION

*RECEIVED & FILED*
*COMMONWEALTH COURT*
*OF PENNSYLVANIA*
*2013 FEB 28 P 2: 19*

## ACCEPTANCE OF SERVICE

    I, Jayson R. Wolfgang, Esquire, accept service of the Complaint on behalf of Defendants the McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services, LLC, and certify that I am authorized to do so.

_2/26/13_
Date

Jayson R. Wolfgang, Esquire
Buchanan Ingersoll & Rooney PC
409 North Second Street, Suite 500
Harrisburg, Pennsylvania 17101-1357

## CERTIFICATE OF SERVICE

I, John M. Abel, hereby certify that on this 28th day of February, 2013, I caused to be

served a true and correct copy of the foregoing document to be mailed by first class postage

prepaid to the following:


Adam Zurofsky, Esquire
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, New York 10005-1702
(Attorney for Defendants McGraw-Hill Companies, Inc., and
Standard & Poor's Financial Services, LLC)


Jayson R. Wolfgang, Esquire
Buchanan Ingersoll & Rooney PC
409 North Second Street, Suite 500
Harrisburg, Pennsylvania 17101-1357
(Attorney for Defendants McGraw-Hill Companies, Inc., and
Standard & Poor's Financial Services, LLC)


By: _____
    John M. Abel
    Senior Deputy Attorney General
    PA Attorney I.D. No.47313
    Office of Attorney General
    Bureau of Consumer Protection
    15th Floor, Strawberry Square
    Harrisburg, Pennsylvania 17120
    717-787-9707